JOHN H. ROBBINS v. FLORA E. TUCKER ET AL.

SUPERIOR COURT        MIDDLESEX COUNTY        FILE No. 9610

Memorandum filed December 19, 1947.

*Aaron J. Palmer,* of Middletown, for the Plaintiff.

*Thomas W. Flood,* of Middletown, for the Defendants.

INGLIS, J.   On and before July 26, 1946, the named de-fendant, hereinafter referred to as the defendant, owned two pieces of land with a dwelling house and other buildings there-on located in Cromwell and fully described in the complaint. She was then living on the property with her husband, Leroy M. Tucker, the other defendant.   There were living with them a granddaughter of the defendant, Muriel Propheter, and her husband and children.   At that time the defendant had a daughter by a former marriage, Mrs. Amelia Draher Robbins, but relations between them were strained.   She also had several grandchildren, the children of Mrs. Robbins.   Of these the plaintiff was the defendant's favorite.   She had mothered him during most of his life and held him in high regard.

A few days before said July 26, the defendant had consulted attorney James M. Kelly about drafting a deed whereby she could convey her property to the plaintiff so that it would go to him when she died.   Mr. Kelly·advised her that, if she executed such a deed and delivered it, title would vest immediately in the grantee, and he suggested that she reserve a life estate.   She immediately said she did not want to reserve such an estate be-cause she had the fullest confidence in the plaintiff.   Mr. Kelly then told her that she could not make a conditional delivery which would be effective as to the condition unless she made the delivery to a third person in escrow.   The defendant then said that that was what she would do, and directed Mr. Kelly to prepare a deed.

Pursuant to that instruction Mr. Kelly prepared a quitclaim deed conveying the title from the defendant to the plaintiff and notified the defendant that it was ready.   On Friday, July 26, the defendant drove to Middletown with her neighbor, Eleanor Varrichio, and after they had done some shopping she went to Mr. Kelly's office and executed the deed.   She left the office with the executed deed and the deed which had conveyed the title to her in her pocketbook.   At that time her intention was to turn the quitclaim deed over to Mrs. Varrichio with instructions to hold it until her death and then deliver it to the plaintiff. When she joined Mrs. Varrichio in the car she told her about the deed and what her intention was but did not at that time deliver the deed because she wanted first to look it over.   She never did give the deed to Mrs. Varrichio.

On the same day she wrote the plaintiff, who was then living in Stonington, telling him that she had executed the deed and that she wanted to talk with him about it, and enjoining him not to mention the matter either to her husband or his, the plaintiff's, mother or to his sister Muriel. This letter the plaintiff received in the late afternoon of Saturday, July 27. On the morning of Sunday, July 28, the plaintiff drove to the defendant's home in Cromwell.

When he arrived he found the defendant in bed in a room on the first floor of the house. It developed that about an hour before he arrived the defendant, while in the yard of her home, had suffered an attack of some sort which rendered her unconscious and had been carried into this bedroom, which was not the bedroom ordinarily occupied by her. After she came to she realized that she was very ill and thought that she was going to die. She requested Muriel to call the plantiff on the phone and ask him to come to her immediately. Although Muriel tried to reach him by phone in Stonington, he had already left that place. He arrived in Cromwell about a half hour later.

Upon his arrival he went immediately to his grandmother. Upon her request he closed the door of the room. She then told him that she thought that she did not have much longer to live, that she had signed the quitclaim deed conveying the property to him, and that if he would bring to her, her pocketbook, which he would find under the mattress in her room, she would give him the deed. He found her pocketbook as directed and took it to her. She thereupon gave him the quitclaim deed, the deed conveying title to her, and a certificate of change of name (made necessary by her marriage since the title had vested in her) which she had had prepared in connection with another transaction. At the time she made him promise that he would not tell her husband or any other members of the family about the transaction and would not record the deed until after her death, saying that if any of those people heard that she had conveyed the property while she was still alive it would make trouble for her. She also said that so long as she lived she would pay the taxes and insurance on the property and the interest on the mortgage, but if ever a time came when she could not do that she would expect him to do it for her, and if he had to take over the burden he might then record the deed. She told him that she would trust him not to turn her out of her home, and to all of this he agreed. They also agreed that he would take care of

the expense of an adequate funeral and burial of her, she telling him that she carried insurance which ought to pay the expense of those items.

Upon all of the evidence, of which the foregoing is merely a summary, it is found that at the time the defendant handed the quitclaim deed to the plaintiff she had abandoned her former in-tention to deliver it to Mrs. Varrichio in escrow. Partly be-cause she believed that her death was impending and partly be-cause the confidence which she felt in the plaintiff had become uppermost in her mind, she had formed the intention to pass the title to him immediately. This was her intention at the time she handed him the deed.

On March 20, 1946, the defendant had conveyed to the plain-tiff a lot of land abutting the first piece described in the com-plaint so that he might build a dwelling house thereon. Because of his inability to finance the construction of the house as plan-ned, he had, prior to July 26, abandoned that undertaking. In August 1946, however, he evolved a plan to build a less expen-sive house, and for two or three weeks during August he stayed at the defendant's home during the week, working on that house. During that period it was his custom to spend weekends with his wife and child in Stonington.

About September 3, the Propheter family having moved out, on the defendant's suggestion he moved his wife and child to Cromwell and from then until October 26 they continued to live with the defendant. Before long trouble developed between the defendant and the plaintiff's wife. This headed up to a heated argument on Saturday, October 5, at which time the defendant told the plaintiff that although he himself might stay on there he must get his wife and child out. The argument was renewed on the following day. At that time the defendant told the plaintiff that both he and his family would have to move. Thereupon the plaintiff reminded the defendant in the presence of the latter's husband that she had deeded the property to him. This was the first definite knowledge the defendant's husband had had of the transaction. He immediately became enraged, asked his wife if it was true and, when she confirmed it, asked the plaintiff whether he did not think that he, the defendant's husband, was entitled to a share in the property. At that time also the defendant's husband ascertained from the plaintiff that the deed had not yet been recorded.

The following day, Monday, October 7, upon the procurement of her husband, the defendant executed and delivered to him a quitclaim deed of the property, reserving a life use, and that deed was immediately put on record. The defendant's husband gave no consideration for this conveyance.

On October 14, 1946, the plaintiff caused to be recorded in the Cromwell land records the quitclaim deed which the defendant had delivered to him on July 28.

On the trial, the defendant's testimony was to the effect that she had never handed the deed to the plaintiff but that in some way he had come into possession of the deed without her knowledge. The fair preponderance of the evidence, however, is to the contrary. Accordingly, the only real question in the case is as to the legal effect of the manual delivery of the deed made to the plaintiff on July 28 under all of the circumstances as they have been found to exist.

In order to constitute a delivery of a deed effective to convey title, two elements are essential. First, there must be a parting by the grantor of his possession of the document and, second, that parting must be with the intention on the part of the grantor to pass the title. *Sweeney* v. *Sweeney*, 126 Conn. 391, 394; *McDermott* v. *McDermott*, 97 Conn. 31, 34; *Porter* v. *Woodhouse*, 59 Conn. 568, 575. In the present case both of those elements were satisfied. As has already been stated, on July 28 the defendant handed the deed over to the plaintiff, and she did it with the intention of immediately vesting the title to the property in him.

That she made the delivery upon the condition that he would not record the deed until a later date does not deprive the delivery of its effectiveness. Such a condition is completely nugatory. *Sweeney* v. *Sweeney*, supra, 395. No claim is made by the defendant that the plaintiff's oral promise to allow her to occupy the property for the remainder of her life is an enforceable promise. On the other hand, the plaintiff stated on argument that he did not desire that any injunction issue directing the defendant to vacate the property, as prayed in his second prayer for relief.

One other question of law involved in the case is whether the delivery was invalidated by the fact that it was made on Sunday. That question turns upon the interpretation of our

statute entitled "Work and recreation on Sunday," § 1452e, Cum. Sup. 1939. 50 Am. Jur. 837, § 43. That statute prohibits the doing of "any secular business or labor, except works of necessity or mercy," upon Sunday.

The conveyance involved in this case was not a business transaction. It was a gift. Under Sunday statutes generally it is held that gifts made on Sunday are valid. 60 C. J. 1110, § 70 (2). The term "secular business" in our statute refers to transactions which involve the passing of a consideration and does not refer to the making of gifts. It is therefore concluded that title passed to the plaintiff from the defendant upon the delivery of the deed even though that delivery was made on a Sunday.

Judgment may enter adjudging that title to the property described in the complaint is vested in the plaintiff free of all claims and interests of the defendants, and setting aside the conveyance from the defendant Flora E. Tucker to the defendant Leroy M. Tucker referred to in the complaint, and that the plaintiff recover from the defendants his taxable costs.